92 A.3d 708

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Richard Scott BAUMHAMMERS, Appellant.**

Supreme Court of Pennsylvania.

Submitted on Briefs Feb. 19, 2013.

Decided May 27, 2014.

358

Caroline Roberto, Esq., for Richard Scott Baumhammers.

Francesco Lino Nepa, Esq., Ronald Michael Wabby Jr., Esq., Allegheny County District Attorney's Office, Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, MCCAFFERY, STEVENS, JJ.

## OPINION

Justice SAYLOR.

This is a capital post-conviction appeal.

The underlying facts are set forth in this Court's opinion resolving Appellant's direct appeal. *See Commonwealth v. Baumhammers*, 599 Pa. 1, 960 A.2d 59 (2008). Briefly, on April 28, 2000, Richard Baumhammers (Appellant) went on a two-hour crime spree in Allegheny and Beaver Counties in which he shot six individuals with a firearm. Appellant first shot to death a Jewish neighbor and set her house on fire. He then drove to public places such as a Chinese restaurant and an Indian grocery store, where he shot five additional persons, all racial or ethnic minorities. Four of these additional victims died of their wounds; the fifth was paralyzed from the neck down. During the crime spree, Appellant also damaged two synagogues by spray-painting swastikas and the word "Jew" onto one of them, and shooting bullets into both. *See id.* at 13–21, 960 A.2d at 67–71. Appellant was charged with five counts of first-degree murder and related offenses, and the matter proceeded to trial from April 27th to May 9th of 2001. The jury found Appellant guilty on all charges. At the conclusion of the penalty phase, the jury determined that the aggravating circumstances outweighed any mitigation and set the penalty at death for all five murders.[1] Appellant's post-

---

1. The jury found the grave-risk-of-death and multiple-murder aggravators as to some of the murders, *see* 42 Pa.C.S. § 9711(d)(7), (11), and only the multiple-murder aggravator as to others. In each case, at least one juror found that Appellant had no significant history of prior criminal convictions, *see id.* § 9711(e)(1), that he was under the influence of extreme mental or emotional disturbance, *see id.* § 9711(e)(2), and that the "catch-all" mitigator applied, *see id.*, § 9711(e)(8) (refer-

sentence motions were denied, and this Court affirmed the judgments of sentence. *See id.* at 66, 960 A.2d at 99.

Appellant filed a counseled, amended petition under Pennsylvania's Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546 ("PCRA"), raising nineteen claims. The PCRA court, per Judge Manning (who was also the trial judge), scheduled a hearing on four of the claims and noted its intent to dismiss the remaining fifteen claims without a hearing. A three-day hearing was held in September 2011, at which numerous witnesses testified. The court ultimately denied relief. After Appellant appealed and filed a concise statement of errors complained of on appeal, *see* Pa.R.A.P. 1925(b), the PCRA court issued an opinion addressing each of the alleged errors and concluding that it had properly denied relief. *See Commonwealth v. Baumhammers,* CC Nos. 2000–14712–14714, *slip op.* (C.P. Allegheny June 29, 2012) ("PCRA Court Opinion").

■ The statutory framework governing our review is well settled. To be eligible for relief, a PCRA petitioner must establish by a preponderance of the evidence that his conviction or sentence resulted from one or more of the circumstances enumerated in Section 9543(a)(2) of the PCRA, and that the allegation of error has not been previously litigated or waived. *See, e.g., Commonwealth v. Sneed,* 616 Pa. 1, 16–17 & n. 13, 45 A.3d 1096, 1105 & n. 13 (2012). For present purposes, the circumstances that would warrant relief are a constitutional violation, or ineffective assistance of counsel, which so undermined the reliability of the truth determining process that no reliable adjudication of guilt or innocence could have taken place. *See id.;* 42 Pa.C.S. § 9543(a)(2). Details of the trial and post-conviction proceedings are discussed below as necessary in connection with specific claims.

encing any other evidence of mitigation concerning the defendant's character and record and the circumstances of his offense). The defense unsuccessfully proffered mitigating factors pertaining to a substantially impaired capacity to appreciate the criminality of one's conduct or conform one's conduct to the law's requirements, and extreme duress (although not such duress as to constitute a defense to prosecution). *See id.* § 9711(e)(3) and (5), respectively.

We note that, because Appellant's direct appeal was filed after this Court's decision in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), any claims that rest on an allegation of ineffective assistance of trial counsel need not be layered to address appellate counsel's stewardship. *See, e.g., Commonwealth v. McGill*, 574 Pa. 574, 589, 832 A.2d 1014, 1023 (2003).

## I. Claims Decided Based on an Evidentiary Record

For the claims on which a hearing was held, we consider whether the PCRA court's findings are supported by the record and free of legal error. *See Commonwealth v. Rega*, 620 Pa. 640, 662–64, 70 A.3d 777, 790 (2013).

## A. Post-trial statements of the Commonwealth's forensic psychiatrist

Appellant first contends that his constitutional rights to due process and to be free of cruel and unusual punishment were violated when the Commonwealth's expert testified in the guilt phase that Appellant did not have schizophrenia. To address this argument, it is helpful to review certain aspects of the trial and PCRA testimony.

At trial, Appellant offered an insanity defense. He presented the testimony of several treating psychiatrists as fact witnesses, and of forensic psychiatrist Dr. James Merikangas as an expert witness. Dr. Merikangas testified that, on the day of the crime, Appellant may have been suffering from paranoid schizophrenia and, although he understood the nature and quality of his actions, he did not know that what he was doing was legally or morally wrong. *See* 18 Pa.C.S. § 315 (setting forth Pennsylvania's insanity defense in terms of the defendant's failure to understand the nature and quality of his conduct or that it "was wrong"). Dr. Merikangas's testimony supported the defense theory that Appellant was suffering from hallucinations in which he believed the FBI was harassing him and causing him physical pain through the use of lasers and poisons, and promised to stop doing so if he would kill ethnic and racial minorities. Dr. Merikangas elaborated that Appellant thought the FBI wanted to discredit his nas-

cent "Free Market" political party and, to that end, directed him to conduct a "right-wing hit." The expert witness opined that Appellant understood that it is ordinarily wrong to kill others, but he believed his conduct was legally and morally justified because he was obeying a government order.

In its rebuttal case, the Commonwealth adduced the testimony of forensic psychiatrist Dr. Michael Welner. Based on a records review involving 230 sources and many hours of interviews with Appellant, Dr. Welner produced a lengthy report. He testified consistent with the report, disputing Dr. Merikangas's conclusions and opining that Appellant was not schizophrenic, he understood the nature and quality of his actions, and he knew his actions were wrong. Dr. Welner disbelieved Appellant's claims of hallucinations, attributing such assertions to after-the-fact malingering. He concluded instead that Appellant acted based on hatred toward non-European immigrants and other minorities. The witness indicated that, although Appellant met the criteria for narcissistic personality disorder, possible antisocial personality disorder, and delusional disorder of a persecutorial type, delusions are different from hallucinations,[2] and moreover, the delusional facet of Appellant's personality had largely receded during the months leading up to the killings. Dr. Welner testified that his conclusion regarding Appellant's hatred-based motive for the killings was supported by Appellant's desecration of the two synagogues, as well as trial testimony and information he gathered for his report suggesting that Appellant had: angrily threatened two Pakistani restaurant patrons in a Pittsburgh suburb in August 1999, telling them to leave America or they would die; stricken a woman with his fist while traveling in France two months later because he thought she was Jewish; visited white-supremacist websites prior to the day in question; and made anti-minority and white-supremacist state-

2. Dr. Welner explained that delusions are fixed, false beliefs, whereas hallucinations are sensory in nature and can include perceiving non-existent sights, sounds, and smells. Dr. Welner agreed that Appellant had had delusions, prominent at one time, that the FBI was harassing him, and that he had written letters to the Pennsylvania Attorney General and a United States Senator requesting help with the imagined harassment.

ments to fellow inmates shortly after his arrest and while awaiting trial.

Six years after the trial, when a massacre occurred at Virginia Polytechnic Institute (Virginia Tech), Dr. Welner was working as a paid consultant for ABC News. In that capacity, he was interviewed about the Virginia Tech shootings and, in passing, made reference to Appellant's case. Dr. Welner also made comments to other media organizations as well as an educational institution between 2007 and 2011, in which he mentioned Appellant's case. In at least three of these comments or interviews, Dr. Welner stated that Appellant suffered from schizophrenia, albeit his actions were motivated by ethnic hatred separate and apart from his schizophrenia.

This suggestion was, of course, inconsistent with Dr. Welner's trial testimony in which he rejected a schizophrenia diagnosis for Appellant. Appellant viewed the inconsistency as material because, in Appellant's view, a schizophrenia diagnosis would have supported his insanity defense better than the personality disorders Dr. Welner described at trial. Thus, at the PCRA hearing, Appellant presented the testimony of forensic psychiatrist Dr. Phillip Resnick concerning the effect if, hypothetically, Dr. Welner had testified at trial that Appellant suffered from schizophrenia. Dr. Resnick testified that: (a) if Dr. Welner had diagnosed Appellant with schizophrenia, the diagnoses of narcissistic personality disorder and possible antisocial personality disorders would have been difficult to support; and (b) a schizophrenia diagnosis would have explained, in terms of a disease of the brain—as opposed to mere personality traits—certain items that may have cast Appellant in a negative light before the jury, such as Appellant's alleged: grandiosity; inappropriate affect (e.g., smiling) at the time of his arrest; lack of empathy; lack of remorse; aloofness; argumentativeness; and inability to maintain steady employment. *See* N.T., Sept. 12, 2011, at 15–24.

Appellant also called Dr. Welner as a PCRA witness and questioned him about the inconsistency between his trial testimony and his subsequent media comments. Dr. Welner preliminarily agreed that schizophrenia is the "most extreme

manifestation of paranoia," N.T., Sept. 13, 2011, at 190, and acknowledged that, in the media, he had indicated that Appellant suffered from schizophrenia at the time of the shootings. He observed, however, that his role as a media consultant is "very different from" his role as a forensic psychiatrist, *id.* at 191, because media outlets are not primarily concerned with specific diagnoses or legal issues, but with broader public implications and the public's sense of vulnerability in the wake of a mass shooting.

As for the particular statements regarding Appellant having schizophrenia, Dr. Welner: clarified that such assertions stemmed from having erroneously recollected Appellant's diagnosis, *see, e.g., id.* at 213 ("I remembered my diagnosis incorrectly."), 237 ("I thought I remembered [Appellant's diagnosis], I remembered it incorrectly."); observed that all such statements were made at least six years after trial and that he had not reviewed his report or any other materials regarding Appellant's case in the interim, *see id.* at 208; and pointed out that he had been involved in analyzing a number of other mass shootings in which a schizophrenia diagnosis had been present, thus possibly explaining why he might have become confused and incorrectly stated that Appellant also had schizophrenia. *See id.* at 213–14. Dr. Welner testified, as well, that, to the extent any of his misstatements regarding Appellant suffering from schizophrenia remained available on the ABC News website, he had taken steps to rectify them. Finally, Dr. Welner stated that he stood by his trial testimony and the specific diagnoses he articulated at that time, which excluded schizophrenia. *See id.* at 232–34. The PCRA court ultimately credited Dr. Welner's explanation that he had simply made a mistake when speaking with the media and other organizations many years after the trial, and pointed out that Appellant offered no evidence to contradict such explanation. *See* PCRA Court Opinion, *slip op.* at 37–38.

Appellant now argues that it is "unreasonable to believe," and "difficult to accept," that Dr. Welner could have misspoken as a media consultant, Brief for Appellant at 16, 18, since he was being paid to fill an important role within a news

organization. Appellant proffers that this is especially so because Dr. Welner was able to remember other details of Appellant's case, most notably the names of the victims, during these same media interviews. On this basis, Appellant argues that Dr. Welner's trial testimony was so unreliable as to render the guilt and penalty verdicts reached by the jury constitutionally infirm under the Due Process Clause and Eighth Amendment. *See* Brief for Appellant at 19. Finally, Appellant reasons that Dr. Welner's post-trial statements in the media constitute newly discovered evidence entitling him to a new trial. *See id.* at 19–20. *See generally* 42 Pa.C.S. § 9543(a)(2)(vi) (allowing for relief where a PCRA petitioner demonstrates that the conviction or sentence resulted from the unavailability of exculpatory evidence that has become available and would have changed the outcome if it had been introduced).

■■■■ Because the PCRA court heard Dr. Welner's responses and observed his demeanor, it was in the best position to determine whether his testimony was credible. *See Commonwealth v. Weiss,* 565 Pa. 504, 518, 776 A.2d 958, 966 (2001). Such determination is "to be accorded great deference," *Commonwealth v. Dennis,* 609 Pa. 442, 457, 17 A.3d 297, 305 (2011), and indeed, is binding on this Court if supported by the record. *See Commonwealth v. Williams,* 619 Pa. 219, 240–41, 61 A.3d 979, 992 (2013); *see also Commonwealth v. White,* 557 Pa. 408, 421, 734 A.2d 374, 381 (1999) ("[T]here is no justification for an appellate court, relying solely upon a cold record, to review the fact-finder's first-hand credibility determinations.").

Here, it is undisputed that Dr. Welner's out-of-court statements were made at least six years after the trial and without the benefit of having reviewed any materials connected with the case since the trial. It is also uncontested that, upon being alerted to the inconsistency with his trial testimony, Dr. Welner took action to ensure that any news articles still appearing online were corrected so that they no longer reflected that Appellant had schizophrenia. Although Dr. Welner was able to remember the names of Appellant's victims, it

does not necessarily follow that he must also have remembered Appellant's diagnosis, and moreover, Dr. Welner explained that he makes a particular effort to remember victims' names "because in my experience they become faceless people." N.T., Sept. 13, 2011, at 236. Thus, we have no grounds to disturb the PCRA court's decision to credit Dr. Welner's testimony to the effect that his post-trial characterization of Appellant as suffering from schizophrenia was a mistake. That decision is supported by the record, and as such, we are bound by it. Accordingly, Dr. Welner's now-disavowed out-of-court statements cannot form the basis of a meritorious constitutional claim.[3]

## B. Lack of a critique of Dr. Welner's testimony

In his next claim Appellant contends that the defense efforts to counter Dr. Welner's trial testimony amounted to ineffective assistance of counsel. As explained, Dr. Welner testified as a psychiatric expert for the prosecution, and Dr. Merikangas testified as a psychiatric expert for the defense. The two experts disagreed over whether Appellant was legally sane at the time of the shootings, and over whether Appellant was suffering from schizophrenia. Dr. Merikangas stated that such a diagnosis was possible and that Appellant was insane, and Dr. Welner rejected both propositions. Additionally, and as discussed, Dr. Welner discounted the concept that Appellant's conduct stemmed from psychotic delusions regarding supposed persecution or harassment by the federal government, and instead attributed Appellant's actions to his antipathy toward ethnic and racial minorities.

During the PCRA proceedings, Appellant retained Dr. Richard Dudley, a clinical and forensic psychiatrist, to evaluate Dr. Welner's methodology and determine whether he could have

---

**3.** This conclusion also precludes Appellant's after-discovered evidence contention. Even if we assume, *arguendo*, that the out-of-court statements were exculpatory, Dr. Welner has now disowned them, and hence, their only potential use at trial would be to impeach his credibility. *See Commonwealth v. D'Amato*, 579 Pa. 490, 519, 856 A.2d 806, 823 (2004) (reciting that, to obtain relief on a newly-discovered-evidence claim, a PCRA petitioner must establish, *inter alia*, that the evidence would not be used solely to impeach credibility).

advised trial counsel on how best to cross-examine Dr. Welner and rebut his testimony, possibly by advancing a defense surrebuttal case. Dr. Dudley issued a report and provided testimony at the PCRA hearing, concluding that Dr. Welner's methodology was flawed. He faulted Dr. Welner, most notably, for not fully exploring the impact that Appellant's delusions had on his life and his ability to function. *See* N.T., Sept. 12, 2011, at 48.

Dr. Dudley gave as an example the fact that Appellant had placed personal ads and utilized female escort services in the days before the crime, but he denied having done this during the videotaped interviews Dr. Welner conducted with Appellant as part of his clinical examination. At trial, Dr. Welner suggested that, because Appellant had placed the ads and contacted the escort services using his real name, and had invited strangers from those services into his home, his persecutory delusions were not sufficiently pervasive to indicate schizophrenia during the timeframe involved, since his actions showed that he was not overly guarded and did not suspect the individuals of being government agents. *See* N.T. Apr. 27–May 9, 2001 ("N.T., Trial"), at 1994–95. Dr. Dudley, who reviewed the videotapes, criticized Dr. Welner's conclusion in this regard because, during his clinical examination, Dr. Welner did not respond to Appellant's denials by confronting him with information suggesting such denials were false, thus foreclosing any investigation into the relationship between Appellant's actions and his "disordered thought process." N.T., Sept. 12, 2011, at 52–53. Dr. Dudley referred to other examples of a similar nature, in each case stating that Dr. Welner had failed to fully "explore" the issue with Appellant.

Ultimately, Dr. Dudley opined that, in view of such omissions, Dr. Welner's diagnoses lacked adequate support, albeit Dr. Dudley disclaimed any intent to: express an opinion as to whether Dr. Welner's diagnoses of Appellant's psychotic or personality disorders were right or wrong; render an independent psychiatric diagnosis; or determine whether Appellant was legally sane at the time of the crimes. *See id.* at 68, 85–86. Instead, Dr. Dudley described his role as limited to

critiquing Dr. Welner's "methodology ... in the range of activities that are part of the forensic examination...." *Id.* at 68–69. Finally, Dr. Dudley noted that, if he had been retained by the defense in 2001, he would have advised counsel on how to develop a more probing cross-examination along the lines of the above, and he would also have been available to testify concerning the flaws he discerned in Dr. Welner's forensic evaluation and overall methodology. *See id.* at 55–58.

Appellant maintains that trial counsel was ineffective for failing to hire an expert such as Dr. Dudley to perform the functions described above, most notably, advise the defense as to how best to cross-examine Dr. Welner, and testify in surrebuttal that Dr. Welner's methodology was flawed. Appellant suggests that counsel must have been aware of the need for such an expert because he complained to the court on more than one occasion that he had insufficient time to review Dr. Welner's lengthy expert report. *See* Brief for Appellant at 22.

██ To prevail on this claim, Appellant must plead and prove by a preponderance of the evidence that his conviction was the result of ineffective assistance of counsel that, under the circumstances, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *See* 42 Pa.C.S. § 9543(a)(2)(ii). The test is substantively the same as the performance-and-prejudice standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), although this Court has divided the performance component into sub-parts dealing with arguable merit and reasonable strategy. Appellant must therefore show that: the underlying legal claim has arguable merit; counsel had no reasonable basis for his act or omission; and Appellant suffered prejudice as a result. *See Commonwealth v. Pierce*, 515 Pa. 153, 158–60, 527 A.2d 973, 975–76 (1987). Because all three "*Pierce* factors" must be demonstrated, the claim fails if any one of them is not proved. *See Commonwealth v. Busanet*, 618 Pa. 1, 18, 54 A.3d 35, 45 (2012).

Although Dr. Dudley's input might have aided the defense at trial, his function would have been limited to advice and impeachment, rather than rebuttal. He criticized Dr. Welner's methodology, but he did not offer a substantive opinion in rebuttal to the one rendered by Dr. Welner. Thus, to the extent Appellant advances that counsel's stewardship was deficient for failing to call a rebuttal witness, the PCRA record does not support the premise that such witness was available or that counsel was aware of, or had a duty to know of, the witness. *See generally Commonwealth v. Weiss*, 622 Pa. 663, 725–26, 81 A.3d 767, 804 (2013) (noting that, to establish ineffectiveness for failing to call an expert witness, an appellant must demonstrate, among other things, that the expert witness existed and was available). Even if one assumes that Dr. Dudley was available to act as an advisor or an impeachment witness at trial, this Court's precedent precludes a finding of arguable merit on that basis alone.[4] Rather, the central issue is whether defense counsel's cross-examination of the prosecution witness was effective, *see Chmiel*, 612 Pa. at 388, 30 A.3d at 1143, bearing in mind that its purpose is to subject the state's expert testimony to meaningful adversarial testing. *See Maryland v. Craig*, 497 U.S. 836, 846, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990). *See generally Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065 (observing that counsel has a duty to bring skill and knowledge to bear so as to render the trial a "reliable adversarial testing process"). To make such an evaluation, it may be helpful to review counsel's cross-examination in the context of the trial as a whole. *See Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065 (explaining that the performance inquiry in any case where counsel's assis-

---

4. *See Commonwealth v. Chmiel*, 612 Pa. 333, 387–88, 30 A.3d 1111, 1143 (2011) ("[T]rial counsel will not be deemed ineffective for failing to call a medical, forensic, or scientific expert merely to critically evaluate expert testimony that was presented by the prosecution."); *accord Commonwealth v. Elliott*, 622 Pa. 236, 272–73, 80 A.3d 415, 437 (2013); *Commonwealth v. Marinelli*, 570 Pa. 622, 644, 810 A.2d 1257, 1269 (2002); *Commonwealth v. Copenhefer*, 553 Pa. 285, 308 n. 12, 719 A.2d 242, 254 n. 12 (1998); *Commonwealth v. Smith*, 544 Pa. 219, 238, 675 A.2d 1221, 1230 (1996).

tance is challenged is whether it "was reasonable considering all the circumstances").

At trial, the defense called numerous treating psychiatrists as fact witnesses to describe Appellant's significant mental infirmities. These included Dr. Christine Martone, the chief psychiatrist of the Allegheny County Behavior Clinic, who stated that she had examined Appellant four and six days after the crimes for competency purposes, and diagnosed him with paranoid schizophrenia, *see* N.T., Trial, at 1791, and Dr. Soroya Radfar, a treating psychiatrist who testified that Appellant was an in-patient under her care in Pittsburgh's Saint Clair Hospital for eleven days in May 1999, having been brought to the emergency room by his father. Dr. Radfar diagnosed Appellant as suffering from a schizoaffective disorder involving delusions, *see id.* at 1736–40, and recounted that, upon entry to the hospital: Appellant was having strong hallucinations; his delusions were fixed and diversified; and on a one-to-ten scale, with ten being the most extreme, he was a ten as compared to all other delusional patients she had examined. Further, Dr. Merikangas, testifying as an expert, gave a detailed recitation of Appellant's psychiatric history, noting that Appellant was subject to psychotic delusions as a result of a physical brain disease, and opining to a reasonable degree of medical certainty that on the day in question he was legally insane.

Although Dr. Welner testified that Appellant was legally sane, counsel extensively cross-examined Dr. Welner. During such cross-examination, counsel brought to light that Dr. Welner: neither treated Appellant nor performed a physical evaluation to rule out a physical cause for Appellant's psychiatric illnesses, but rather, relied on information from other doctors, *see* N.T., Trial, at 2116, 2133, 2136; agreed that Appellant met the criteria for delusional disorder of a persecutorial type, *see id.* at 2110; and agreed, as well, that persecutory delusions can be the cause of violent behavior in a patient, as reflected in two prominent psychiatry reference books, *see id.* at 2120.

At the PCRA hearing, moreover, guilt-phase counsel, William Difenderfer, Esq., articulated reasonable grounds for not calling an additional expert witness or hiring an expert in an advisory capacity. Counsel testified that he and Dr. Merikangas prepared extensively for the cross-examination of Dr. Welner, *see* N.T., Sept. 14, 2011, at 271, and that he was satisfied with both the preparation and the actual cross-examination. *See id.* at 282. When asked why he did not call a surrebuttal witness to criticize Dr. Welner's methodology, counsel stated his belief that such a witness was unnecessary given the responses he was able to elicit when cross-examining Dr. Welner, together with the strength of the defense case. *See id.* at 272–73. In this latter regard, counsel noted that Dr. Merikangas' testimony concerning Appellant's mental condition was "complemented" by the evidence given by Dr. Martone, who, being employed by the court, would be seen by the jury as impartial. *See* N.T., Sept. 14, 2011, at 275.[5] Finally, counsel explained that he was concerned about "what another expert would do to this jury," since the jurors had already "heard from numerous psychiatric experts, and it was extremely apparent that we took issue with Dr. Welner's testimony." N.T., Sept. 14, 2011, at 273; *see also id.* at 283 ("[W]e can talk now about psychiatrists and doctors, but I think what's missed is there's 12 lay people hearing this case.").

In light of these factors, we agree with the PCRA court that Appellant has not demonstrated that counsel's stewardship, as it relates to impeaching or rebutting Dr. Welner, was constitutionally deficient. *See* PCRA Court Opinion, *slip op.* at 41. To the contrary, when viewed against the backdrop of the evidence marshaled during the defense case, and in the context of the trial as a whole, there is ample support for the PCRA court's determination that counsel used reasonable

5. As noted, Dr. Martone, to be precise, worked for the Allegheny County Behavior Clinic, which in turn performs psychological and psychiatric work for the trial court relative to competency and sentencing. *See* N.T., Trial, at 1790; *Baumhammers*, 599 Pa. at 42, 960 A.2d at 84. The trial court allowed limited testimony from Dr. Martone during the defense case in the interests of justice, on the basis of necessity. It observed, however, that ordinarily her testimony would have been precluded on conflict-of-interest grounds. *See* N.T., Trial, at 2748–49.

professional skill and subjected Dr. Welner's testimony to meaningful adversarial testing. Accordingly, Appellant is not entitled to relief on this claim.

## C. Insufficient time to review Dr. Welner's report

In a one-page argument, Appellant next maintains that his rights under the Due Process Clause and the Eighth Amendment were violated when the trial court denied counsel's requests for additional time to review Dr. Welner's 89–page report. He states that, with additional preparation time, counsel could have offered testimony along the lines of that given by Dr. Dudley at the PCRA hearing, and that, instead, the "evidence supporting the prosecution's theory met a rushed and incoherent adversarial challenge and the jury accepted [Dr.] Welner's testimony." Brief for Appellant at 24. Appellant also faults appellate counsel for failing to raise this issue on direct appeal.

Due to the late arrival of the Welner report, counsel requested extra preparation time on several occasions, including at the conclusion of jury selection. At that juncture, the trial court noted that, because the jury had already been selected and would have to remain idle during any delay, the court was only willing to give counsel one extra day. In fact, trial started on April 27, 2001, three days after jury selection concluded.

Depending on the nature of the materials in question, three days may not have appeared to provide sufficient preparation time to the defense team. Still, Dr. Welner did not testify until twelve days after trial commenced—after the prosecution and defense had each presented their case-in-chief.[6] Impor-

6. As for Appellant's assertion that the jury accepted Dr. Welner's testimony, this is not certain. Although the jurors rejected Appellant's insanity defense, they did not have to accept Dr. Welner's testimony to do so, as it is possible they simply concluded that the defense failed to prove insanity in the first instance. *See* 18 Pa.C.S. § 315(a) (allocating the burden to the defendant to prove insanity); N.T., Trial, at 2687 (reflecting the court's jury charge that the law presumes all persons to be sane and the defendant must prove otherwise); *see also id.* at 2665 (containing the court's instruction that the jurors are "not bound to

tantly, as well, during the PCRA proceedings trial counsel affirmed that his ability to cross-examine Dr. Welner was not ultimately impaired by the late delivery of the Welner report. To the contrary, he testified that he was

> very satisfied with what our cross-examination and preparation was with Dr. Welner. If I would see something glaring today that ... could have been developed if the [c]ourt would have given us another week or another month or another day, I'm not seeing it. So ... I totally stand by the cross-examination of Dr. Welner.

N.T., Sept. 14, 2011, at 282–83.

This testimony was implicitly credited by the PCRA court, as that tribunal relied on it in rejecting the claim. *See* PCRA Court Opinion, *slip op.* at 42; *cf. Commonwealth v. King*, 618 Pa. 405, 418 n. 4, 57 A.3d 607, 615 n. 4 (2012) (inferring that the PCRA court found a particular witness to be credible where it relied heavily upon that witness's testimony). It is also confirmed by our own review of trial counsel's extensive cross-examination of Dr. Welner, as discussed above.

In post-conviction collateral proceedings, the defendant bears the burden to plead and prove eligibility for relief. *See* 42 Pa.C.S. § 9543(a). In view of the lack of evidence supporting the present constitutional claim, and trial counsel's PCRA testimony suggesting that the defense was not hindered in its ability to cross-examine Dr. Welner, Appellant has failed to carry that burden. Therefore, this claim does not entitle him to a new trial.[7]

## D. Lack of mitigation expert

▮ Next, Appellant claims that he was denied effective counsel in the penalty phase because no mitigation expert was retained to analyze his parents' experiences during World War

accept an opinion from an expert merely because it is the testimony of someone having special skill or knowledge").

7. Because the underlying contention lacks arguable merit, Appellant's derivative claim of appellate counsel's ineffectiveness necessarily fails. *See Commonwealth v. Roney*, 622 Pa. 1, 48, 79 A.3d 595, 623 (2013).

II and explain how those experiences affected the way they responded to his mental illness. Appellant's theory is that, by investigating the deprivations and traumas his parents suffered during the war, an expert could have given the jury a better understanding of why his parents were willing to support him financially, including providing him with money, cars, and travel expenses, notwithstanding that Appellant never sought or obtained full-time employment. Appellant suggests that this would have added important context to his overall family history, and would have painted his parents in a sympathetic light rather than leaving the jury with the impression that they were merely indulgent.

Appellant's penalty phase case was extensive.[8] Most relevant to the present claim, Appellant's parents testified at length in the penalty phase. They described for the jury their family history, as well as their experiences with Appellant from the time of his birth. The family history related by Mr. and Mrs. Baumhammers reflected that they were both born in Latvia in the mid–1930s, although they did not meet until after their families had immigrated to the United States. They were young children in Latvia during World War II when the nation was occupied, first by the Soviet Union, then by Nazi Germany, and then again by the Soviet Union. Because of arrests, executions, property seizures, and deportations to Siberia of entire Latvian families under the Soviet occupation, ten percent of the population was displaced, and Appellant's parents' families fled the country in 1944 and traveled to Germany, hoping to "surrender" to the American forces at the conclusion of the war. N.T., Trial, at 3007. They were ultimately successful in this, although they had to endure

---

8. For example, Drs. Keshevan and Merikangas testified in support of the extreme-mental-or-emotional-disturbance mitigator, 42 Pa.C.S. § 9711(e)(2); *see* N.T., Trial, at 2929 (Dr. Keshevan), 2946 (Dr. Merikangas); *see also supra* note 1, and Dr. Merikangas separately testified that two other mitigating factors were present—namely, that Appellant's capacity to understand the criminality of his conduct or conform his conduct to the law's requirements was substantially impaired, *see* 42 Pa.C.S. § 9711(e)(2), and that he acted under extreme duress, *see* 42 Pa.C.S. § 9711(e)(5); N.T., Trial, at 2946–47. The penalty-phase defense case also included testimony from numerous prison guards who all agreed Appellant was a model prisoner.

multiple hardships in the interim. For example, Appellant's mother survived the Allied firebombing of Dresden, Germany in February 1945, and both parents' families lived for approximately five years in refugee camps after the war—where employment was scarce—before resettling in the United States. *See* N.T., Trial, at 2892–99 (testimony of Appellant's father, Andrejs Baumhammers); *id.* at 3006–08 (testimony of Appellant's mother, Inese Baumhammers).

This family history served as background information, whereas the primary focus of the parents' testimony pertained to their experiences dealing with their mentally ill son, his delusional thought processes spanning seven years, and their efforts to obtain treatment to remedy the problem or at least mitigate the symptoms. This latter testimony additionally, and very graphically, described Appellant's substantially deteriorating mental state during the years 1993–2000, leading up to the murders.

In support of the present claim, Appellant retained Leslie Lebowitz, Ph.D., a clinical psychologist specializing in psychological trauma, to interview Appellant's parents, produce a report, and testify at the PCRA hearing concerning the impact of the parents' wartime experiences on their raising of Appellant. *See* N.T., Sept. 12, 2011, at 93 ("I was asked to evaluate the issue of whether or not there was a significant trauma history present in [Appellant's] family of origin, and, if so, to opine as to whether or not that had any influence on the family dynamics or on their response to [Appellant's] mental illness."). At the hearing, she testified about the parents' difficult childhood experiences during the war and their eventual migration to the United States, as well as the increasingly acute mental health problems from which Appellant suffered as he grew into adulthood.

We acknowledge that the hardships delineated by Dr. Lebowitz at the post-conviction stage, in terms of Mr. and Mrs. Baumhammers' experiences during World War II and their later anguish and struggles in dealing with a mentally-ill son, are very unfortunate. The fact remains, however, that Dr. Lebowitz's testimony was substantially duplicative of the evi-

dence brought forth at trial. *Accord* PCRA Court Opinion, *slip op.* at 43–44 ("It is really difficult to discern from her testimony what exactly Dr. Lebowitz could have added that was not already presented."). As noted, Appellant's parents had recounted at trial their World War II experiences, albeit in a somewhat more abbreviated fashion.[9] Further, the jury heard a comprehensive description of Appellant's behaviors, mental illnesses, and personality disorders through, *inter alia,* the testimony of a series of treating physicians and the reading of Mrs. Baumhammers' diary.

Appellant submits, however, that counsel's "basic failure" was in not hiring a mitigation specialist, and points to *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), as providing an example of ineffective assistance which occurred when penalty phase counsel "failed to engage a 'forensic social worker' to generate a 'social history.'" Brief for Appellant at 34 (quoting *Wiggins,* 539 U.S. at 524, 123 S.Ct. at 2537). Nevertheless, this Court has expressed that "the same [penalty-phase] investigation will not be required in every case," since counsel must have wide latitude in making tactical decisions. *Commonwealth v. Philistin,* 617 Pa. 358, 402, 53 A.3d 1, 26 (2012) (citing *Cullen v. Pinholster,* —— U.S. ——, ——, 131 S.Ct. 1388, 1406–07, 179 L.Ed.2d 557 (2011)); *see also Cullen,* —— U.S. at ——, 131 S.Ct. at 1407 ("It is rare that constitutionally competent representation will require any one technique or approach." (internal quotation marks and brackets omitted)).

Additionally, this case is readily distinguishable from *Wiggins.* In *Wiggins,* the defendant had suffered continuing egregious abuse as a child, including abuse at the hands of his biological mother and numerous foster parents. His counsel failed to investigate his life history and introduced no evidence of it, opting instead to rely solely on Wiggins' lack of a criminal history, notwithstanding that his penalty-phase coun-

9. Dr. Lebowitz added various details to give a fuller picture of the severe nature of those experiences, most notably with regard to persistent hunger and insecurity, and Mrs. Baumhammers' extreme fear as a young girl during the Dresden bombing.

sel had previously told the jurors they would hear evidence of Wiggins' difficult childhood. Here, by contrast, counsel presented substantial testimony regarding Appellant's parents' childhoods and the hardships they met with during World War II, as well as detailed accounts of Appellant's mental infirmities that persisted over at least a seven-year period.

There is no *per se* requirement that, in all capital cases, counsel must employ a separate mitigation specialist regardless of the other mitigating evidence that is brought forth. *See generally Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064 (clarifying that, beyond the general command that counsel's representation meet an objective standard of reasonableness, "[m]ore specific guidelines are not appropriate"). Thus, we disagree with Appellant's argument that, in the circumstances presented here, penalty phase counsel had a professional obligation to engage a psychologist such as Dr. Lebowitz to present a social history of the Baumhammers family to the jury.

It also bears noting that, to the degree Dr. Lebowitz discussed or analyzed the motivations and actions of Appellant's family, her testimony focused almost exclusively on Mr. and Mrs. Baumhammers rather than Appellant.[10] What was missing from Dr. Lebowitz's presentation was any explanation of how Appellant's parents' wartime experiences could have provided mitigation relative to Appellant himself, or the murders of which he was convicted. According to the record, Appellant was born in the United States in 1965 and was raised in a middle- or upper-middle-class family in which his parents were dentists and his sister became a successful radiologist. He did not experience any of the wartime hardships that his parents did. Appellant's parents paid for him to

10. For instance, Dr. Lebowitz suggested that what might have seemed to the jury like indulgence on the part of Mrs. Baumhammers could also be explained by understanding that one ramification of the terror she experienced during the war was that she was subject to a "hyper-reactivity that makes it difficult to maintain perspective." N.T., Sept. 13, 2011, at 127; *see also id.* at 134 (suggesting that parents with a history of trauma are more susceptible to manipulation by a mentally ill child).

attend law school, and he eventually became a licensed attorney. Appellant's parents also arranged for him to receive psychiatric treatment upon the manifestation of his symptoms and made efforts to ensure the treatment continued as necessary. For her part, Dr. Lebowitz only interviewed Appellant briefly and did not include a section on Appellant in her report. *See* N.T., Sept. 13, 2011, at 161–63.

In his advocacy to this Court, moreover, Appellant does not identify any aspect of Dr. Lebowitz's report or testimony that directly links his parents' experiences with anything that could be considered mitigating above and beyond what the jury heard at trial. Appellant's lack of specificity in this regard is illustrated by the highly generalized nature of the passage from Dr. Lebowitz's testimony that he has chosen to highlight as a demonstration of how his family history allegedly affected him:

> [I]f you want to understand the family, you have to understand all the players in the family. If you want to understand a child in the family, you need to understand who their parents are and what the historical, cultural and personal context is of the people who make up that family, and particularly when there's trauma, or really under any circumstances, the histories of all the players matter, and they explain things about why people do what they do.

*Id.* at 135, *quoted* in Brief for Appellant at 31, *and in* Reply Brief for Appellant at 3. Although statements such as these may be true as far as they go, they do not purport to elucidate, for the benefit of the fact-finder, how the family's overall social and generational history supports mitigation in the circumstances. Additionally, our own review of the PCRA record does not reveal any more particularized way in which Dr. Lebowitz connected Appellant's family history with potential substantive mitigation.

■ A PCRA petitioner cannot succeed on a claim that counsel was ineffective for failing to call a witness if the witness's testimony would not have materially aided him. In such a case, the underlying-merit and prejudice prongs of the *Pierce* test logically overlap. To show prejudice, the petition-

er must demonstrate that there is a reasonable probability that, but for counsel's allegedly unprofessional conduct, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *See Commonwealth v. Gibson*, 597 Pa. 402, 418, 951 A.2d 1110, 1120 (2008). Presently, Appellant's substantive argument concerning prejudice is limited to a single paragraph in which, without citation to the record, he suggests that: the Commonwealth portrayed his upbringing as "spoiled" and "privileged;" this had an adverse impact on his mitigation case; and Dr. Lebowitz could have provided a "mental health explanation" for why his parents treated him the way they did. Brief for Appellant at 36. Appellant also references a supposed "connection between [his] parents' trauma history and [his] burgeoning mental illness," Brief for Appellant at 36, but he does not state what that connection is. He also alludes to the concept that Dr. Lebowitz's testimony could have weakened any suggestion by the Commonwealth that Appellant was more blameworthy because he was an indulged and spoiled child and adult, *see id.* at 36–37, but, again, he does not explain how that impression could have been refuted. *See also id.* (alluding, without further explanation, to "how the parents' trauma impacted Appellant's mental health" (emphasis removed)).

These are material deficiencies because the only mitigating circumstance to which Dr. Lebowitz's testimony could have pertained was the catch-all mitigator, which is expressly defined in terms of the "character and record *of the defendant* and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(8) (emphasis added). Even if we were to assume, for instance, that Dr. Lebowitz could have convinced the jury that the parents' actions in indulging Appellant's wishes to maintain a comfortable lifestyle without having to engage in gainful employment stemmed, not from poor parenting skills, but from the psychological implications of their wartime experiences, this would only tend to mitigate the blameworthiness (if any) of the parents' behavior, and not Appellant's. Nor do we believe that the jurors' weighing of the aggravators and

mitigators would have been materially altered on the basis of Dr. Lebowitz's assertions, since the weighing process is limited, by definition, to aggravating and mitigating circumstances that were actually found. *See* 42 Pa.C.S. § 9711(c)(iv).

In light of the above, because Appellant has not adequately explained how Dr. Lebowitz's testimony would have been helpful, counsel cannot be deemed ineffective for failing to present such testimony. Likewise, even if we assumed, *arguendo*, that Appellant could somehow establish the first two prongs of the *Pierce* test for ineffective assistance of counsel, he has failed to demonstrate prejudice. Therefore, for this additional reason, Appellant's claim necessarily fails. *See generally Commonwealth v. Walker*, 613 Pa. 601, 611–12, 36 A.3d 1, 7 (2011) (noting that an ineffectiveness claim may be denied upon showing that any one of the three prongs is not satisfied).

## II. Claims Dismissed Summarily

On August 11, 2011, the PCRA court entered an order noting its intent to dismiss without a hearing the remaining PCRA claims, that is, those other than the ones for which a hearing was held. *See* Docket Entry 146. *See generally Commonwealth v. Albrecht*, 606 Pa. 64, 67, 994 A.2d 1091, 1093 (2010) ("The PCRA court need not hold a hearing on every issue appellant raises, as a hearing is only required on 'genuine issues of material fact.'" (quoting *Commonwealth v. Clark*, 599 Pa. 204, 212, 961 A.2d 80, 85 (2008), and Pa.R.Crim.P. 909(B))). At a status conference that day, the court stated that the PCRA petition "fails to establish the[r]e are genuine issues concerning any material facts as to those claims, and the [c]ourt concludes that [Appellant] is not entitled to post-conviction collateral relief on those claims." N.T., Aug. 11, 2011, at 17.[11]

11. Once the court furnished this notice, it was required to give Appellant at least 20 days to respond and cure any perceived deficiencies. *See Commonwealth v. Rivera*, 619 Pa. 464, 465–66, 65 A.3d 290, 291 (2013) (*per curiam*); Pa.R.Crim.P. 909(B)(2)(b). The petition was ultimately dismissed on September 23, 2011, more than 20 days later.

 To obtain reversal of a PCRA court's summary dismissal of a petition, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief. *See Commonwealth v. Paddy,* 609 Pa. 272, 291–92, 15 A.3d 431, 442 (2011) (quoting *Commonwealth v. D'Amato,* 579 Pa. 490, 513, 856 A.2d 806, 820 (2004)). The controlling factor in this regard is the status of the substantive assertions in the petition. *See D'Amato,* 579 Pa. at 513, 856 A.2d at 820. Thus, as to ineffectiveness claims in particular, if the record reflects that the underlying issue is of no arguable merit or no prejudice resulted, no evidentiary hearing is required. *See Commonwealth v. Pirela,* 556 Pa. 32, 54, 726 A.2d 1026, 1037 (1999). For each such claim, we review the PCRA court's action for an abuse of discretion, *see Commonwealth v. Simpson,* 620 Pa. 60, 73, 66 A.3d 253, 261 (2013) (citing *Commonwealth v. Collins,* 585 Pa. 45, 70, 888 A.2d 564, 579 (2005)); *Commonwealth v. Keaton,* 615 Pa. 675, 748, 45 A.3d 1050, 1094 (2012); *Commonwealth v. Hutchinson,* 611 Pa. 280, 354, 25 A.3d 277, 320 (2011), taking into account the degree of specificity required of the PCRA court. *See Commonwealth v. Williams,* 566 Pa. 553, 569, 782 A.2d 517, 527 (2001). Thus, for example, where the court's pre-dismissal notice fails to give sufficiently specific notice to the petitioner as to its reason for its intended dismissal, a remand is appropriate to correct the error. *See id.*

With these guidelines for appellate review, we proceed to address each of the remaining claims Appellant raises in his brief.

## A. Lack of guilty-but-mentally-ill instruction

 Appellant argues that his guilt-phase attorney was ineffective for failing to request a jury instruction that he could be found guilty but mentally ill. He states that, since he offered an insanity defense, he was entitled to such an instruction based on a provision of the Crimes Code that states:

A person who timely offers a defense of insanity in accordance with the Rules of Criminal Procedure may be found "guilty but mentally ill" at trial if the trier of facts finds,

beyond a reasonable doubt, that the person is guilty of an offense, was mentally ill at the time of the commission of the offense and was not legally insane at the time of the commission of the offense.

18 Pa.C.S. § 314(a).[12] Appellant submits that if the jury had found him guilty but mentally ill, it would also have been forced to conclude that he had established the mitigating circumstance that his capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." 42 Pa.C.S. § 9711(e)(3). Appellant reasons that, due to ineffectiveness in the guilt phase, he suffered prejudice in the penalty phase since the jury did not find the proffered (e)(3) mitigator. *See supra* note 1.

While we do not deny that guilt-phase ineffectiveness can, under some circumstances, result in sentencing-phase prejudice, the difficulty with Appellant's claim is that this Court held as early as the late 1980s that a guilty-but-mentally-ill verdict is unavailable as a matter of law in the guilt phase of a capital case. In *Commonwealth v. Young*, 524 Pa. 373, 572 A.2d 1217 (1990), the Court first articulated its rationale, explaining that such a verdict:

> reflects a penological concern that should be considered in determining the appropriate sanction for the offense. In the usual situation the judge is entrusted with determining the appropriate sentence, and the jury's function is confined to determining the guilt of the accused. The verdict providing for "guilty but mentally ill" represents an exception to this general rule. By rendering this judgment, the jury is permitted to advise the sentencing judge to consider the fact of mental illness in the exercise of his sentencing

---

**12.** The statute defines "mentally ill" as "[o]ne who as a result of mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." 18 Pa.C.S. § 314(c)(1). This largely tracks the language of the (e)(3) mitigator, which applies when "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." 42 Pa.C.S. § 9711(e)(3).

decision. Capital cases are unique in that the jury and not the judge sets the penalty in such cases. The consideration of a possible verdict of guilty but mentally ill is a matter that would appropriately be rendered by a jury in a capital case during the sentencing phase as opposed to the guilt[ ] phase. We permit the jury to rule upon this penological concern during the guilt phase in all other cases simply because they have no opportunity for input in the sentencing phase. That consideration is not present in capital cases.

*Id.* at 392–93, 572 A.2d at 1227. Although Appellant is correct in observing that the above limitation is not reflected in the statutory text, the reasoning in *Young* was reaffirmed on multiple occasions in the years prior to Appellant's trial. *See, e.g., Commonwealth v. Faulkner,* 528 Pa. 57, 72, 595 A.2d 28, 36 (1991); *Commonwealth v. Hughes,* 536 Pa. 355, 376–77, 639 A.2d 763, 773–74 (1994); *Commonwealth v. Williams,* 557 Pa. 207, 250, 732 A.2d 1167, 1190 (1999) ("In a capital case, an assertion of 'guilty but mentally ill' is properly considered only in the penalty phase of trial and is subsumed within the mitigating circumstances set forth at Section 9711(e)(2) and (e)(3)[.]").

Appellant candidly recognizes this, *see* Brief for Appellant at 40 (describing the limitation on the guilty-but-mentally-ill verdict as having become "enshrined in Pennsylvania decisional law"), but argues that counsel's stewardship was nonetheless deficient because counsel failed to argue for a change in the law based on Section 314(a)'s plain language. In this latter regard, Appellant references *Commonwealth v. Lassiter,* 554 Pa. 586, 722 A.2d 657 (1998), a case in which this Court determined that defense counsel was at fault because he failed to inform the defendant that the Commonwealth's only alleged aggravating circumstance—that the crime was committed in the perpetration of a felony, *see* 42 Pa.C.S. 9711(d)(6)—could not be found for accomplices such as herself. This failure on counsel's part led Ms. Lassiter to plead guilty to second-degree murder to avoid the death penalty, when she was ineligible for the death penalty in the first instance. *See*

*Lassiter,* 554 Pa. at 595, 722 A.2d at 662.[13] *Lassiter,* however, is distinguishable because no "enshrined," contrary interpretation of the scope of the (d)(6) aggravating factor existed at the time Ms. Lassiter pled guilty. Thus, the case did not involve a finding that the attorney was ineffective for failing to argue for a change in settled law, but rather, for failing to recognize the statute's limited application based on its plain text. In the present matter, however, Appellant is suggesting that his counsel erred by failing to argue for a change in settled law.

Appellant disagrees that *Lassiter* is distinguishable on these grounds, and suggests that *Commonwealth v. Williams,* 524 Pa. 218, 570 A.2d 75 (1990), embodied a holding contrary to *Lassiter. See* Brief for Appellant at 41. *Williams,* however, involved a killing where the defendant and a confederate took turns striking the victim in the head with a tire iron or a socket wrench until the victim died, and the Court described the pair as "co-murderers" and "co-brutalizers." *Id.* at 222 n. 6, 233, 570 A.2d at 77 n. 6, 83. There was no indication in *Williams* that the defendant was merely an accomplice, and the issue of whether Section 9711(d)(6)'s scope subsumes accomplices was not expressly addressed by the Court. As well, *Lassiter* makes no mention of *Williams,* much less purports to overrule it.[14]

▬▬▬▬ Trial counsel's performance is evaluated under the standards in effect at the time of trial. *See Commonwealth v. Spotz,* 616 Pa. 164, 261, 47 A.3d 63, 122 (2012); *cf. Commonwealth v. Bennett,* 618 Pa. 553, 580, 57 A.3d 1185, 1201 (2012) ("[C]ounsel will not be faulted for failing to predict a change in

13. The relevant portion of the lead opinion in *Lassiter* represented the views of six Justices, although the opinion was a plurality in other respects.

14. In *Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191 (2006), the Court cited several cases in which the jury found the (d)(6) aggravator relative to an individual who claimed, on appellate review, to have been an accomplice. *See id.* at 82 n. 39, 896 A.2d at 1239 n. 39. Notably, many of those cases involved a distinct issue, namely, whether accomplice liability for first-degree murder is appropriate in view of the requirement that the perpetrator have a specific intent to kill. More to the point, none of the cited cases involved an express holding that the (d)(6) aggravator's scope included accomplices.

the law."). As a logical corollary, counsel cannot be held ineffective for failing to request a jury instruction that was affirmatively prohibited by Pennsylvania law at the time of trial. *See Commonwealth v. Fletcher*, 604 Pa. 493, 560–61, 986 A.2d 759, 801 (2009); *cf. Commonwealth v. Hughes*, 581 Pa. 274, 355, 865 A.2d 761, 810 (2004) (noting counsel cannot be deemed ineffective for failing to object to an instruction that was legally required at the time of trial). Here, as explained, a guilt-phase jury instruction under Section 314(a) of the Crimes Code was unavailable at the time of Appellant's trial (as indeed it still is). That being the case, counsel cannot have been ineffective for not requesting one.

## B. Lack of life-with-mental-health-treatment instruction

In his next claim, Appellant again references Section 314 of the Crimes Code, but this time in relation to the sentencing-phase jury charge. His contention is two-fold. First, he maintains that counsel was ineffective for failing to request that the trial court inform the jurors that they could return "a life sentence *with* mental health treatment," Brief for Appellant at 44 (emphasis in original), as an alternative to the two sentences permitted by the capital sentencing statute. *See* 42 Pa.C.S. § 9711(a)(1) (providing that "the jury shall determine whether the defendant shall be sentenced to death or life imprisonment"). Second, and relatedly, Appellant avers that counsel was ineffective for failing to request the jury be informed that he would be eligible for mental health treatment if he were sentenced to life imprisonment. *See* Brief for Appellant at 46.

The Commonwealth argues that this claim is waived because it does not appear among the claims raised in the PCRA petition.[15] Appellant does not deny this but reasons that the claim is nonetheless preserved because it is "related to the previous claim," Reply Brief for Appellant at 12, and more-over, it was discussed in a pleading responsive to the Com-

15. As to this claim, we use "PCRA petition" instead of "amended petition" to avoid confusion, since the issue involves whether the amended PCRA petition was further amended, as discussed below.

monwealth's answer to the PCRA petition. *See* Petitioner's Response to the Commonwealth's Answer, Docket Entry 139, at 9–12.[16] Appellant views this responsive pleading as having "clarified his claim regarding entitlement to the [guilty but mentally ill] instruction." Reply Brief for Appellant at 13. Appellant also submits that the claim is preserved because it was raised in his Concise Statement of Errors Complained of on Appeal, *see id.* at 14, and because his counsel made a generalized statement near the conclusion of the evidentiary hearing that none of the claims in the PCRA petition were being waived. *See id.* at 13 (quoting N.T., Sept. 14, 2011, at 308).

Claim IX of the PCRA petition, on which the present issue is based, is entitled, "Petitioner Was Denied His Rights To Due Process And Effective Assistance Of Counsel, And Under Pennsylvania Law, When The Jury Was Not Instructed That It Could Find Petitioner Guilty But Mentally Ill." PCRA Petition at 44. The body of the claim pertains exclusively to the guilt phase and the alleged harm that ensued from counsel's failure to request a guilty-but-mentally-ill charge. *See id.* at 44–46, ¶¶ 83–88. No issue is raised in the petition with regard to what the jury should have been told in the sentencing phase relative to the availability of psychiatric treatment for mentally ill individuals sentenced to life imprisonment, and there is no contention that an instruction should have been provided informing the jurors that they could return a sentence of "life imprisonment with mental health treatment." Thus, Appellant's present distinct contentions regarding the sentencing-phase jury instructions are more than mere "clarifications" of the original claim, as Appellant suggests. Rather, they amount to additional substantive claims that would have had to appear in the PCRA petition, or an authorized amendment thereto, to be preserved. *See* Pa.R.Crim.P. 902(B) ("Each ground relied upon in support of the relief requested shall be stated in the [PCRA] petition. Failure to

16. Although denominated as an "Answer" to the PCRA petition, *see* Docket Entry 138 at 1, the Commonwealth's filing comprised a motion to dismiss the petition. *See id.* at 111.

state such a ground in the petition shall preclude the defendant from raising that ground in any proceeding for post-conviction collateral relief."); *see also Commonwealth v. Rainey,* 593 Pa. 67, 86, 928 A.2d 215, 226 (2007) (noting that issues not raised in a PCRA petition are waived and cannot be considered for the first time on appeal).

Our criminal procedural rules reflect that the PCRA judge "may grant leave to amend ... a petition for post-conviction collateral relief at any time," and that amendment "shall be freely allowed to achieve substantial justice." Pa.R.Crim.P. 905(A); *see Commonwealth v. Williams,* 573 Pa. 613, 633, 828 A.2d 981, 993 (2003) (noting that the criminal procedural rules contemplate a "liberal amendment" policy for PCRA petitions). Nevertheless, it is clear from the rule's text that leave to amend must be sought and obtained, and hence, amendments are not "self-authorizing." *Commonwealth v. Porter,* 613 Pa. 510, 523, 35 A.3d 4, 12 (2012). Thus, for example, a petitioner may not "simply 'amend' a pending petition with a supplemental pleading." *Id.* Rather, Rule 905 "explicitly states that amendment is permitted only by direction or leave of the PCRA Court." *Id.* at 523–24, 35 A.3d at 12; *see also Williams,* 573 Pa. at 625, 828 A.2d at 988 (indicating that the PCRA court retains discretion whether or not to grant a motion to amend a post-conviction petition). It follows that petitioners may not automatically "amend" their PCRA petitions via responsive pleadings.

Here, Appellant never sought leave to amend his PCRA petition to insert a new claim relating to what the jury should have been told in the sentencing phase with regard to mental health treatment for individuals who are sentenced to life in prison. Nor can this new contention reasonably be construed as subsumed within the prior one, which, as explained, relates only to the guilt-phase jury instructions on the possibility of returning a guilty-but-mentally-ill verdict. Additionally, the PCRA court did not treat Appellant's responsive pleading as a request for leave to amend; the record contains no discussion of such a request and the court did not address

this new substantive contention in its opinion disposing of Appellant's PCRA claims. Finally, Appellant's counsel's generalized assertion near the end of the evidentiary hearing that Appellant was not waiving any of the claims in the petition for which no evidentiary hearing was held is insufficient to have constituted a request to amend the petition, or otherwise to have complied with the rules regarding amendment as explained above. *See generally Williams*, 566 Pa. at 569, 782 A.2d at 527 (stating that, upon receipt of a notice that the PCRA court intends to dismiss claims, "counsel must undertake a careful review of the pleadings and other materials to ensure that a sufficient offer has been made to warrant merits review"). Nor could such assertion have expanded the substantive scope of the claim to include an allegation that the penalty-phase jury instructions were defective.

Therefore, since the present claim was not raised in Appellant's PCRA petition, and no request was made to amend the petition to include it, it is waived. Finally, waiver cannot be avoided solely by reference to Appellant's Concise Statement of Matters Complained of on Appeal, as such a statement, which is provided after the notice of appeal has already been filed, cannot operate to add new substantive claims that were not included in the PCRA petition itself. *See generally Commonwealth v. Williams*, 900 A.2d 906, 909 (Pa.Super.2006).

## C. Involuntary medication during trial

 Appellant next maintains that he was forcibly medicated during trial in violation of his constitutional rights, and that his trial counsel was ineffective for failing to litigate and enforce those rights.[17] After Appellant was arrested on April 28, 2000, he was examined by psychiatrist Dr. Laszlo Petras at the Beaver County Jail. During the following week, Appellant was also examined on two occasions by Dr. Martone, *see supra* note 5, who ultimately concluded that he was incompetent to

17. Appellant appears to proffer the underlying constitutional argument as a separate substantive basis for relief. As that argument is waived, only the derivative ineffectiveness claim is cognizable. *See* 42 Pa.C.S. § 9543(a)(3); *Commonwealth v. Gibson*, 597 Pa. 402, 429, 951 A.2d 1110, 1126 (2008).

stand trial. *See* N.T., May 9, 2000, at 4. *See generally* 50 P.S. § 7402(a) (providing that a defendant is incompetent to stand trial if he is unable to understand the nature or object of the proceedings against him, or to participate and assist in his defense); *Commonwealth v. Sanchez,* 589 Pa. 43, 56, 907 A.2d 477, 484 (2006). Accordingly, Appellant was sent to Mayview State Hospital, *see Baumhammers,* 599 Pa. at 14, 960 A.2d at 67, where Dr. Petras was his treating physician. Several months later, in September 2000, a competency hearing was held at which Dr. Petras testified. The doctor indicated that Appellant had regained competency due to a treatment regimen that included Zyprexa, an antipsychotic drug. *See* N.T., Sept. 15, 2000, at 12. Based on this testimony, the trial court ruled that Appellant had become competent to stand trial. *See id.* at 32.

Thereafter, Appellant was present at a pre-trial motions hearing held on April 11, 2001, one week before jury selection began. During the course of the hearing, the judge asked Appellant directly if he was taking medication. Appellant answered, "I am taking Zyprexa medication." N.T., Apr. 11, 2001, at 167–68.

Appellant argues that he was involuntarily medicated during trial and that this violated his rights pursuant to *Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992).[18]

18. In *Riggins,* the defendant offered an insanity defense to a murder charge and was treated with an antipsychotic drug. He moved to suspend administration of the drug until the end of trial, arguing that its continued administration would prevent him from showing the jury his true mental state. After the motion was summarily denied, the case proceeded to a jury trial at which Riggins testified. Riggins was convicted and sentenced to death. Based on *Washington v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178 (1990) (recognizing that an individual has a protected liberty interest in avoiding unwanted administration of antipsychotic drugs), the Supreme Court held that the administration of the drug over Riggins' objection implicated his due process rights and could only be justified if the state established an overriding need for it—such as by showing that treatment with the drug was medically appropriate and, considering less intrusive alternatives, was necessary to protect Riggins' health or safety or the safety of others, or to obtain an adjudication of Riggins' guilt or innocence. *See Riggins,* 504 U.S. at 135, 112 S.Ct. at 1815; *see also Commonwealth v. Sam,* 597 Pa. 523, 538 n. 11, 952 A.2d 565, 573 n. 11

He states that he suffered prejudice because the medication had an adverse impact on his alertness and demeanor during trial. Appellant suggests that he is therefore entitled to a new trial. Barring such relief, Appellant contends that he is entitled to a remand for an evidentiary hearing on the issue. *See* Brief for Appellant at 52; Reply Brief for Appellant at 18. In its Rule 1925(a) opinion, the PCRA court concluded that nothing in the record established that Appellant was forcibly medicated during his trial. *See* PCRA Court Opinion, *slip op.* at 30. Appellant reasons that this conclusion was erroneous because the record indicates that he was, in fact, involuntarily medicated, as reflected by the testimony provided by Dr. Petras at the September 2000 competency hearing.

According to that testimony, Appellant remained in close contact with his attorney during the months he was at Mayview. Upon admission, Appellant was initially hesitant to participate in psychological testing, but after consulting with his lawyer, he agreed to cooperate. *See* N.T., Sept. 15, 2000, at 12–13. In addition, and most relevant to this claim, Appellant refused to take more than four milligrams of the antipsychotic drug Trilafon—the medication Appellant was initially given at Mayview before being switched to Zyprexa—because he believed that four milligrams was sufficient for his needs and he disliked the drug's side effects. Thus, when given a higher dosage, Appellant would take four milligrams and spit the rest out. *See id.* at 13, 15. Dr. Petras described that, upon observing this behavior, he told Appellant "that if his

(2008) (discussing *Riggins*); *Hughes*, 581 Pa. at 311, 865 A.2d at 783 (summarizing *Riggins'* holding).

Based on *Harper* and *Riggins*, the Supreme Court eventually articulated a four-part test for the permissibility of involuntary medication in *Sell v. United States*, 539 U.S. 166, 181, 123 S.Ct. 2174, 2185, 156 L.Ed.2d 197 (2003). *See Sam*, 597 Pa. at 537–38, 952 A.2d at 573; *Commonwealth v. Watson*, 597 Pa. 483, 506–07, 952 A.2d 541, 554–55 (2008) (reciting the four-part test). To the degree that standard may be construed as more stringent than the one set forth in *Riggins*, it is inapposite because *Sell* was decided after Appellant's trial. *See King*, 618 Pa. at 423, 57 A.3d at 618 ("[C]ounsel's performance [is] judged by the prevailing professional standards in existence at the time of trial."). In any event, we find that no genuine issue has been raised that Appellant was subjected to involuntary medication, as discussed below.

condition would deteriorate to a certain point we might have to force the medication against his will." *Id.* at 13. The doctor stated that, after again consulting his lawyer, Appellant began voluntarily taking the medication. *See id.*

Appellant derives from this passage that he was "threatened that if he did not take the medication, that he would be subject to forcible administration of it," Brief for Appellant at 50–51, and urges that "such threats cannot possibly constitute a knowing, intelligent, and voluntary waiver" of his constitutional rights. *Id.* at 51. He maintains that trial counsel was ineffective for failing to request "hearings and findings" on whether he was being forced to take medication and whether such action was appropriate in view of the medication's alleged side-effects. *Id.* at 54.

We find Appellant's suggestion that the above testimony regarding Trilafon, given in September 2000, evidences that the administration of a different drug (Zyprexa) was accomplished involuntarily at trial more than seven months later, to be highly attenuated.[19] Dr. Petras never implied that the drug had been forcibly administered or that Appellant's condition worsened to the point where he would have to be medicated against his will. Additionally, and contrary to Appellant's argument, Dr. Petras noted that Zyprexa was substituted for Trilafon because it was just as effective but did not give rise to the side-effects that Appellant found objectionable. As such, Zyprexa was more palatable to Appellant. *See id.* at 15, 17; *see also* N.T., Trial, at 1821–22 (reflecting Dr. Petras's testimony that "I switched him to Zyprexa because the side-effect profile" was "favorabl[e] compared to Trilafon"). Furthermore, Dr. Petras clarified during trial that, although Appellant would have preferred not to take medication while at Mayview, he had nonetheless agreed to take a low dose of Trilafon, which was inadequate for his needs; thereafter, instead of forcing a higher dosage on Appellant, the hospital switched Appellant to Zyprexa. *See* N.T., Trial, at 1822–23. Accord-

19. The record reflects that Appellant was medicated with Zyprexa, rather than Trilafon, not only at the pre-trial hearing on April 11, 2001, but also during trial. *See, e.g.,* N.T., Trial, at 1397.

ingly, Dr. Petras's trial testimony reflects that Mayview never reached the juncture where it had to pursue involuntary medication in response to a decline in Appellant's condition.

We note, as well, that Appellant did not provide any indication that his taking of Zyprexa was involuntary. At the pretrial motions hearing in April 2001 (approximately two weeks before trial started), Appellant said, simply, "I am taking" the medication. Although Appellant stresses that two trial witnesses testified that his appearance at trial was different from his appearance on the day of the incident, this testimony does not purport to suggest whether the administration of the drug was voluntary or involuntary. Thus, there is nothing in the record that affirmatively indicates Appellant was forcibly medicated at the time of trial. *See generally Powell v. Kelly*, 531 F.Supp.2d 695, 728 (E.D.Va.2008) (observing that no *Riggins* violation occurs where a defendant is medicated pursuant to a doctor's directive and does not refuse the medication); *Basso v. State*, 2003 WL 1702283, *3 (Tex.Crim.App.2003) ("[I]n order for the *Riggins* test to apply, the record must affirmatively reflect that the defendant was forcibly medicated." (internal quotation marks omitted)); *Ex Parte Thomas*, 906 S.W.2d 22, 24 (Tex.Crim.App.1995) ("The threshold question [is] whether applicant was forcibly medicated.").

In *Hughes*, this Court faced a similar claim together with a similar lack of factual support or development in the record or pleadings. Following a competency hearing, the prosecutor requested that Hughes remain on his medication, and this was the sole basis on which Hughes argued that his medication was involuntarily administered. Further, Hughes had been taking the drug for several months and the record contained no indication that he asked that the medication be discontinued. As well, Hughes did not assert that he advised counsel of a desire to stop taking the medication. This Court concluded that, "[a]bsent an offer from Appellant explaining why the maintenance of his medication was involuntary, we will not assume that counsel was ineffective for failing to object." *Hughes*, 581 Pa. at 311–12, 865 A.2d at 783 (citing *Common-*

*wealth v. O'Donnell,* 559 Pa. 320, 341, 740 A.2d 198, 210 (1999)).

We find the present case to be comparable. Here, in arguing that his medication was involuntarily administered, Appellant relies solely on Dr. Petras's remark that if a certain circumstance were to arise Appellant might have to be forced to take Trilafon. Although this remark arguably hints at the possibility of forcible medication in a way that the *Hughes* prosecutor's request did not, there is no indication that the condition referenced by Dr. Petras ever arose, and further, Appellant was changed to a different medication because it lacked Trilafon's adverse side-effects (which constituted the underlying reason Appellant objected to taking Trilafon in the first instance). Notably, Appellant had been voluntarily taking medications for many years prior to the killings, as he and his family had known since 1993 that he had psychiatric problems, and he had obtained medical treatment accordingly. Finally, and as noted, there is no information in the record suggesting that Appellant ever asked to be taken off Zyprexa.

In light of the above, we find that Appellant's claim rests on grounds that are as speculative as those forwarded by Hughes. As in *Hughes,* therefore, and in light of the lack of record support for the allegation of involuntariness, the PCRA court acted within its discretion in dismissing this claim without a hearing. *See generally Commonwealth v. Clark,* 599 Pa. 204, 228, 961 A.2d 80, 94 (2008) (where a PCRA petition's assertions were speculative and the petitioner offered no evidence in support of a factual claim, concluding that his "assertion simply failed to raise an issue of material fact"); *Commonwealth v. Abdul–Salaam,* 571 Pa. 219, 230, 812 A.2d 497, 503 (2002); *Commonwealth v. Scott,* 561 Pa. 617, 627–28 & n. 8, 752 A.2d 871, 877 & n. 8 (2000).[20]

20. To the degree Appellant's brief may be viewed as forwarding a substantively distinct claim that counsel was ineffective for failing to ensure Appellant was competent to be tried, *see* Brief for Appellant at 53 (citing *Drope v. Missouri,* 420 U.S. 162, 175, 95 S.Ct. 896, 905, 43 L.Ed.2d 103 (1975)), that contention was not advanced before the PCRA court. *See* Pa.R.A.P. 302(a) (prohibiting the raising of issues for the first time on appeal).

### D. *Caldwell* violation

 Appellant's next contention is that his penalty-phase counsel was ineffective for failing to object to a portion of the trial court's jury charge that, according to Appellant, violated his Eighth–Amendment rights by diminishing the jury's sense of personal responsibility for the death verdicts.[21]

 In *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the jury imposed the death penalty after the prosecutor stated that "your decision is not the final decision" because it "is automatically reviewable by the [state] Supreme Court." *Id.* at 325–26, 105 S.Ct. at 2638. For its part, the trial court "not only failed to correct the prosecutor's remarks, but in fact openly agreed with them." *Id.* at 339, 105 S.Ct. at 2645. The Supreme Court vacated the sentence, concluding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. at 2639. That circumstance was found to violate the Eighth Amendment in particular because such minimization of the jury's role was viewed as incompatible with the Amendment's requirement that the jury make an individualized decision that death is the appropriate punishment in a specific case. *See id.* at 333, 105 S.Ct. at 2641–42.

This Court faced a similar situation in *Commonwealth v. Jasper*, 558 Pa. 281, 737 A.2d 196 (1999), albeit based on remarks by the court rather than the prosecutor. In that

---

21. This and other issues, as stated in Appellant's brief, also reference Article I, Section 13 of the Pennsylvania Constitution, which prohibits "cruel punishments." In each instance, however, the argument section does not develop the state-constitutional argument in any meaningful fashion. Thus, we will only apply Eighth Amendment law in each such instance. *See Commonwealth v. Batts*, 620 Pa. 115, 136–37, 66 A.3d 286, 299 (2013) (noting that Article 1, Section 13 is construed as coterminous with the Eighth Amendment absent a persuasive analysis to the contrary in accordance with *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991)).

matter, the trial judge had instructed the jury that it was not the final arbiter of the sentence, stating:

Somewhere down the line, if you do impose the death penalty, the case will be reviewed thoroughly. And after thorough review the death penalty may be carried out. I won't go into all the various reviews that we have. That shouldn't concern you at this point.

*Id.* at 282, 737 A.2d at 196. Based on *Caldwell,* the *Jasper* Court vacated the sentence, noting that the "plain import of the [trial] court's remarks is that although the jury may impose the death penalty, it may not be carried out, thus removing from the jury the responsibility for imposing the death penalty." *Id.* at 282, 737 A.2d at 196. The Court continued that the "central idea is that when remarks about the appellate process minimize the jury's sense of responsibility for the verdict of death, the sentence of death must be reversed." *Id.* at 284, 737 A.2d at 197.

In the present case, Appellant challenges certain remarks made by the Commonwealth, as well as penalty-phase jury instructions, on similar grounds. To understand these remarks and instructions in context, it is helpful to set forth defense counsel's statements to the jury as well.

During the penalty phase, defense counsel emphasized in his opening statement that the jurors would "carry [their sentencing decision] to their graves," and that it would be impossible to "come back" in three or five years and change the sentence if they had regrets upon hearing in the media that Appellant was about to be executed. Counsel added that "[t]he question is, do you need to kill him" and suggested that, although killing a mentally ill person might have been normative during the Middle Ages, we have "progressed beyond those days." *See* N.T., Trial, at 2783, 2790.

At the conclusion of the penalty-phase, the prosecuting attorney, in his summation, responded to the above advocacy as follows:

You are not here to reflect on social policy.... You are here to evaluate the evidence ... and apply the law.... The

notion that [defense counsel] suggested to you that you are killing [Mr.] Baumhammers is simply wrong, misleading and pandering to the sensibilities not present in this case, not part of the evidence and not part of the law. Continue to do your job in this phase as you did in the earlier phase.

*Id.* at 3081.

Defense counsel then largely repeated what he had expressed in his opening statement, again emphasizing that Appellant was mentally ill, that the jurors could not return later and change their minds, and that the Commonwealth was attempting to persuade the jury to "yield to revenge" and to "kill him." *Id.* at 3101.

After the jury recessed, the Commonwealth objected to portions of the defense opening and closing arguments and requested curative instructions. One of the aspects to which the Commonwealth objected was the concept that the jury itself was going to "kill" Appellant. *See id.* at 3108. Accordingly, the trial court instructed the jury as follows:

You are not to consider matters such as revenge or sympathy and you are not to allow counsel's emotional appeals to you to sway your decision in that regard. *You, performing your task as jurors, do not bear personal responsibility with regard to the death of Mr. Baumhammers . . . .* Your duty here is to fairly and impartially decide these matters and to render a sentencing verdict consistent with the law as I am going to give it to you now. . . . [Y]our sentence will depend on what you find upon aggravating and mitigating circumstances. . . . *Remember that your verdict is not merely a recommendation. It actually fixes the punishment of death or life in prison* . . . . I direct you to find the facts, to apply the law as I have given you to the facts and to act in accordance with your solemn oath that you have taken[.]

*Id.* at 3110–12 (emphasis added).

In assessing these comments and instructions, we observe that neither the court nor the prosecutor referred to the appellate review process, or otherwise suggested that the jury's verdict would be subject to review or correction by

other authorities. This materially distinguishes the present case from *Caldwell, Jasper,* and the other decisions referenced by Appellant, *see* Brief for Appellant at 57 (citing, *inter alia, Riley v. Taylor,* 277 F.3d 261 (3d Cir.2001) (*en banc* )), all of which dealt with the possibility that the jury might return a death verdict upon believing that a separate legal entity would make the final decision as to its appropriateness. *See Commonwealth v. Baker,* 511 Pa. 1, 21–25, 511 A.2d 777, 788–90 (1986) (summarizing the constitutionally problematic aspects of drawing the jury's attention to appellate review, as catalogued in *Caldwell* ); *cf. Adams v. Wainwright,* 804 F.2d 1526, 1530 (11th Cir.1986) (finding a *Caldwell* violation where the trial court advised the jury, contrary to state law, that it only filled an advisory role in determining the defendant's sentence), *rev'd on other grounds sub nom Dugger v. Adams,* 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). In this respect, *Baker* explained that references to appellate review are especially problematic because, among other things, they tempt the jury to believe that only if it returns a sentence of death will "respected legal authorities" be called upon to review the case. *Baker,* 511 Pa. at 24, 511 A.2d at 789; *accord Caldwell,* 472 U.S. at 333, 105 S.Ct. at 2642. Nothing in the present record gives rise to this type of difficulty.

Furthermore, and relatedly, the question resolved in *Caldwell* was expressly framed in terms of whether the jury had been misled with regard to its responsibility for determining the appropriateness of the sentence itself. *See Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1 (1994) (explaining that *Caldwell* prohibits prosecutorial comments that "mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should *for the sentencing decision* " (emphasis added)). As such, *Caldwell* did not directly address a situation like the present one, where the jurors are told they are not responsible for the defendant's actual death but are solely responsible for the death sentence.

Still, we find the first emphasized sentence in the above jury charge to be less than ideal under *Caldwell* and

*Jasper*, as it at least approaches the type of instruction that has been disapproved. Thus, we caution that common pleas courts should be scrupulous not to provide instructions that may appear to diminish a capital jury's responsibility with regard to the death of the defendant. With that said, however, we also recognize that this portion of the instruction was aimed at counterweighing the emotional appeal of Appellant's penalty phase counsel. *Cf. People v. Fierro*, 1 Cal.4th 173, 3 Cal.Rptr.2d 426, 821 P.2d 1302, 1340 (1991) ("In admonishing the jurors not to 'feel guilty' or 'personally responsible,' the prosecutor was merely suggesting ... that the moral blame for the crimes and their consequences rests with defendant, not with the jurors"), *disapproved on other grounds by People v. Letner*, 50 Cal.4th 99, 112 Cal.Rptr.3d 746, 235 P.3d 62 (2010). Furthermore, when read as a whole, the overall instruction clearly conveyed to the jurors that they *were* solely responsible for the sentence, as reflected in the second emphasized sentence in the above passage. *See Commonwealth v. Keaton*, 556 Pa. 442, 472, 729 A.2d 529, 545 (1999) (noting that the jury charge must be considered as a whole); *Commonwealth v. Abu–Jamal*, 521 Pa. 188, 209, 555 A.2d 846, 856 (1989) (addressing a *Caldwell* claim upon review of the sentencing hearing record "in its entirety").

In light of the above, and applying a similar analysis to the prosecutor's remarks, we conclude that neither those remarks nor the court's jury instructions as a whole raise the types of concerns animating *Caldwell* and its progeny. In particular, they were unlikely to have substantially undermined the jurors' sense of responsibility to determine the appropriate sentencing verdict—either by reference to appellate review, or by downplaying the jury's role as merely advisory in nature. Accordingly, as we find no constitutional error, the issue underlying Appellant's present claim of ineffective assistance lacks arguable merit.

### E. Multiple-murder aggravator

Pennsylvania's capital sentencing statute lists as an aggravating circumstance that the defendant "has been con-

victed of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue." 42 Pa.C.S. § 9711(d)(11) (the "multiple-murder aggravator"). The jury found this aggravator as to all five murders. Appellant submits that his penalty-phase attorney was ineffective for failing to challenge this factor on Eighth–Amendment vagueness grounds.[22]

The difficulty with Appellant's argument—as the PCRA court pointed out, *see* PCRA Court Opinion, *slip op.* at 24–25—is that this Court has held that the multiple-murders aggravator is not unconstitutionally vague under the Eighth Amendment. *See Commonwealth v. Fletcher*, 580 Pa. 403, 861 A.2d 898 (2004). The *Fletcher* Court noted, preliminarily, that "to survive an Eighth Amendment challenge 'an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' " *Id.* at 428, 861 A.2d at 912 (indirectly quoting *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983)). The Court reasoned that, "[a]s worded, this aggravating circumstance clearly narrows the class of persons eligible for the death penalty by excluding those individuals who have not been convicted of another murder." *Id.* at 428, 861 A.2d at 913.[23]

---

**22.** In *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the Supreme Court distinguished the void-for-vagueness doctrines as they arise under the Due Process Clause and the Eighth Amendment:

> Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk.... Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them ... with the kind of open-ended discretion which was held invalid in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

*Cartwright*, 486 U.S. at 361, 108 S.Ct. at 1857–58.

**23.** This also distinguishes the (d)(11) aggravator from those at issue in the two Supreme Court cases on which Appellant relies, namely,

Still, Appellant posits that "[a]n aggravating circumstance that is vague on its face can be cured by a narrowing construction issued by the highest court in the jurisdiction," and criticizes the PCRA court for failing to notice that *Fletcher* was decided after his trial, meaning that "there was no such narrowing construction" at that time. Brief for Appellant at 61. The argument is unavailing, as *Fletcher* did not provide a narrowing construction. Rather, *Fletcher* held that the aggravator satisfies Eighth Amendment requirements. Thus, the *Fletcher* Court rendered a determination as to the constitutional validity of the aggravator as it existed at the time of Appellant's trial. In this regard, we note that there was no legislative change to the multiple-murder aggravator between the time of trial and the date *Fletcher* was decided, and that the text of the aggravator was recited word-for-word in the penalty-phase jury instruction, *see* N.T., Trial, at 3114, meaning that *Fletcher* affirmed the validity of the aggravating circumstance that was found by Appellant's sentencing jury.

Appellant nonetheless submits that the word "convicted" was vague because that word can and should be construed to mean "sentenced." Appellant maintains that caselaw establishes that the strict legal meaning of "conviction" requires a sentence to have been imposed. Notably, this is not a vagueness challenge, but an assertion that counsel was ineffective for failing to pursue a limiting construction whereby the multiple-murder aggravator can only pertain if the defendant

*Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). *Godfrey* rejected application of a Georgia statute that listed as an aggravating factor that the offense was "outrageously or wantonly vile, horrible and inhuman," where the jury was given no guidance concerning the meaning of those terms. The Court explained that, left uninstructed, many lay jurors would consider all murders outrageously or wantonly vile, horrible and inhuman. *See id.* at 428–29, 100 S.Ct. at 1765. The Court in *Cartwright* reached the same conclusion with regard to the phrase, "especially heinous, atrocious, or cruel" (at least absent some limiting construction) since, again, "an ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.' " *Cartwright,* 486 U.S. at 364, 108 S.Ct. at 1859. By contrast, the multiple-murder aggravator implicates a more objective factual circumstance and, as such, is not as susceptible to arbitrary application.

has already been sentenced, on a prior occasion, for a different murder. *See* Brief for Appellant at 61–62.

This may be a novel claim in the specific context of the (d)(11) aggravator. More than three decades ago, however, this Court rejected an identical argument relative to the meaning of "convicted" in the context of the (d)(10) aggravating circumstance—a closely-related aggravator that refers, in relevant part, to a defendant's having "been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable[.]" 42 Pa.C.S. § 9711(d)(10). In *Commonwealth v. Travaglia*, 502 Pa. 474, 467 A.2d 288 (1983), the Court observed that, although the argument that "convicted" should be read to signify "sentenced" may have had superficial appeal, it failed upon closer scrutiny. The Court stated that the "clear import" of the portion of the (d)(10) aggravator quoted above "is to classify the commission of multiple serious crimes as one of the bases upon which a jury might rest a decision that the crime of which the defendant stands convicted . . . merits the extreme penalty of death." *Id.* at 496, 467 A.2d at 299; *accord Commonwealth v. Cross*, 508 Pa. 322, 339, 496 A.2d 1144, 1153 (1985). The Court continued by focusing particular attention on the phase, "or at the time of the offense at issue," explaining that such language

> highlights the incongruity of the construction urged by the Appellants. *By including offenses committed contemporaneously with the offense in issue, the legislature clearly indicated its intention that the term "convicted" not require final imposition of sentence, but cover determinations of guilt as well.* Given the practical operation of the criminal justice system, a contemporaneous offense would either be tried together with the "offense at issue" or severed and tried separately. In the former situation, it would be impossible for sentencing to have occurred prior to the jury's consideration of sentence on the "offense at issue"; in the latter, the vagaries of scheduling and conducting separate trials of a single defendant, within certain time limits

and amidst the ordinary operation of a court calendar, would make it virtually impossible. At best, such factors would render it completely arbitrary [under the interpretation advanced] whether a contemporaneous offense would qualify as an aggravating circumstance under subsection (d)(10).

*Travaglia,* 502 Pa. at 496–97, 467 A.2d at 299 (emphasis added).

This reasoning applies equally to the same phrase ("or at the time of the offense at issue") as it appears in subsection (d)(11), *see generally Commonwealth v. Beasley,* 505 Pa. 279, 287, 479 A.2d 460, 464 (1984) (in the context of a similar challenge to the (d)(9) aggravator, citing *Travaglia* and suggesting that the General Assembly can be presumed to have intended the same meaning for "conviction" across all subsections of 42 Pa.C.S. § 9711(d)); *Commonwealth ex rel. McClenachan v. Reading,* 336 Pa. 165, 169, 6 A.2d 776, 778 (1939) ("In interpreting a statute using the word 'conviction' the court has held that the strict legal meaning must be applied *except where the intention of the legislature is obviously to the contrary.*" (emphasis added)), as the trial court would likely have recognized if counsel had made the argument presently advanced by Appellant. Accordingly, as Appellant's underlying issue lacks arguable merit, he is not entitled to relief on his ineffective-assistance claim.

## F. Death qualification

Next, Appellant contends that counsel was ineffective during *voir dire* for not attempting to rehabilitate three prospective jurors who were excused for cause based on expressed reservations about imposing the death penalty.

The Supreme Court held in a case predating *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), that the death penalty "cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced

general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968); *see Commonwealth v. Uderra,* 580 Pa. 492, 504, 862 A.2d 74, 81 (2004). That was at a time when the jury was invested with unlimited discretion in its choice of sentence. Because sentencing juries could no longer exercise such discretion after *Furman* and *Gregg,* the Court eventually clarified that an individual may be excused for cause whenever his views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (adopting the standard set forth in *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). This is because a defendant's Sixth Amendment right to an impartial jury "drawn from a venire that has not been tilted in favor of capital punishment" must be balanced against the Commonwealth's "strong interest" in seating jurors "who are able to apply capital punishment within the framework state law prescribes." *Uttecht v. Brown,* 551 U.S. 1, 9, 127 S.Ct. 2218, 2224, 167 L.Ed.2d 1014 (2007). Additionally, "in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts." *Id.* Therefore, the decision whether to disqualify a juror for cause lies within the sound discretion of the trial court and error will not be found absent an abuse of discretion. *See Commonwealth v. Stevens,* 559 Pa. 171, 197, 739 A.2d 507, 521 (1999) (citing *Commonwealth v. Colson,* 507 Pa. 440, 454, 490 A.2d 811, 818 (1985)).

Presently, the trial court conducted jury selection by interviewing a number of venirepersons as a group, and then holding follow-up interviews with certain individuals. The first juror that Appellant argues should have been rehabilitated was Juror No. 51. During the initial group interview, Juror No. 51 raised her hand when the judge asked if anyone's

ability to be fair and impartial would be affected by the Commonwealth's decision to seek the death penalty in this case. During her individual interview by the court and counsel for both sides, Juror No. 51 stated that she believes in the death penalty, "but I don't know how I feel about my sitting in judgment on that." In response to further questioning on whether she could follow the law and return a sentence of death in an appropriate case, the juror stated, "That I'm not sure about." Defense counsel explained the process regarding the weighing of aggravating and mitigating factors, and noted that the court would instruct her that, if the former outweighed the latter, she would have to return a death sentence. When counsel asked if she would be able to do so, she replied: "I could follow the Judge's instructions. But I'm not sure that I want to do that. I'm not sure that I want to be put in that position, to have to do that." N.T., Apr. 18–24, 2001 ("N.T., Jury Selection"), at 351–54. The Commonwealth moved to exclude the juror for cause, and the trial court granted the motion. No objection was lodged by defense counsel.

The second juror that Appellant states should have been rehabilitated was Juror No. 36. When he was interviewed individually, the Commonwealth reminded him it might request the death penalty depending on the outcome of the guilt phase, and asked if he had any moral, philosophical, or personal opposition to capital punishment. The juror responded, "I would not want to be responsible for that." On follow-up questioning, he stated, "I would not want to carry [imposition of the death penalty] for the rest of my life." He later added, "What I tried to say was I did not want to be responsible for the rest of my life of making that decision. It would be a personal thing with me. I can make the decision, but I don't want the responsibility hanging over me forever." N.T., Jury Selection, at 687–88. He was excused for cause, and counsel did not object.

The final juror at issue was Juror No. 61. She indicated that, based on her Christian religion, "the death penalty is not for myself to decide." Subsequently, she expressed that she would be able to "vote one way or another," but added that

she would impose a higher burden on the Commonwealth where the death penalty was at issue. When the Commonwealth asked if she could impose the death penalty in a situation where she thought it was warranted, she answered, "That's a hard question to answer." N.T., Jury Selection, at 1053–54. As with Jurors 51 and 36, the court granted the Commonwealth's motion to exclude for cause, and defense counsel did not object.

Appellant submits that the failure to object to the exclusions for cause, and to attempt to rehabilitate these jurors, amounted to ineffective assistance of counsel. We disagree.

"A juror's bias need not be proven with unmistakable clarity." *Commonwealth v. Morales,* 549 Pa. 400, 417, 701 A.2d 516, 525 (1997) (citing *Witt,* 469 U.S. at 425, 105 S.Ct. at 852–53).[24] Although Juror No. 51 stated nominally that she "believed in" the death penalty, her answers included repeated equivocation as to whether she could personally impose it in any given case, since she did not wish to have to decide whether another person should live or die. Jurors 36 and 61 exhibited similar uncertainty, as can be seen from their answers above. This type of tentativeness during the death-qualification process has been held sufficient to justify the exclusion for cause in several prior cases. *See Commonwealth*

24. In *Witt,* the Supreme Court clarified that the governing standard, whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath:

does not require that a juror's bias be proved with unmistakable clarity. This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 424–25, 105 S.Ct. at 852–53.

*v. Carson*, 590 Pa. 501, 573, 913 A.2d 220, 262 (2006) (citing cases). In *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130 (1996), for example, the Court found no error in the exclusion of a juror who did not "feel comfortable having to make a decision about someone else's life" and who "always" doubts whether imposing the death penalty is correct. *Id.* at 249, 681 A.2d at 137. Likewise, in *Morales*, the Court approved the trial court's actions in excluding a juror who stated, "I'm not certain that I could judge someone fair enough to give them the death penalty." *Morales*, 549 Pa. at 418, 701 A.2d at 525. Additionally, in *Commonwealth v. Lewis*, 523 Pa. 466, 567 A.2d 1376 (1989), the Court affirmed exclusions where one venireperson stated she "would have great difficulty" voting for the death penalty, and another indicated that she "might not be able to vote for it" due to her religious beliefs. *Id.* at 475, 567 A.2d at 1380; *see also Commonwealth v. Hardcastle*, 519 Pa. 236, 256–57, 546 A.2d 1101, 1111 (1988) (concluding that juror's answer that he did not know whether he could impose the death penalty provided the trial court with an adequate basis to excuse the juror for cause over defense counsel's objection).

As developed above, all three prospective jurors gave answers which demonstrated similar levels of equivocation. Whether or not these answers would have been sufficient to support exclusion for cause under *Witherspoon* in the pre-*Gregg/Furman* era, the standard that now controls (as stated in *Witt*) is more permissive, in part because of the channeling function accomplished via specific factual questions such as whether certain aggravating circumstances are present. *See Witt*, 469 U.S. at 422, 105 S.Ct. at 851. Further, because the Supreme Court articulated the test in the disjunctive, it is sufficient if the trial court believes that a prospective juror's beliefs and apprehensions would "substantially impair" (as opposed to "prevent") the performance of his duties as a juror in accordance with his instructions and his oath. *Accord Commonwealth v. Holland*, 518 Pa. 405, 416–17, 543 A.2d 1068, 1073 (1988), *overruled on other grounds by Commonwealth v. Freeman*, 573 Pa. 532, 574, 827 A.2d 385, 410 (2003).

The types of equivocal answers and serious apprehensions about imposing the death penalty and having to live with that decision for the rest of their lives, as reflected in the answers given above by the three venirepersons at issue, are adequate, in our view, to support a conclusion by the trial court that the *Witt* standard was satisfied—particularly in light of the deference accorded to the common pleas court in these types of decisions. *See supra* note 24. Further, counsel is presumed to have rendered reasonably effective assistance as required by *Strickand, see Gibson,* 597 Pa. at 417 n. 7, 951 A.2d at 1118 n. 7, and there is nothing in the record or briefs that demonstrates that such presumption has been overcome.

## G. Guilt-phase victim testimony

■ The next assertion of trial counsel's ineffectiveness arises from the fact that the only one of Appellant's shooting victims to survive, Sandip Patel, testified during the guilt phase concerning the facts of the shooting. *See* N.T., Trial, at 330–35. Appellant's claim does not concern the content of Mr. Patel's testimony, but the condition he was in when he testified.

Mr. Patel was paralyzed from the neck down when Appellant shot him, severing his spinal cord. Appellant alleges that Mr. Patel appeared before the jury in a wheelchair and used breathing tubes to help him answer questions, all of which inflamed the jury's passions and deprived Appellant of a fair sentencing hearing, since the guilt-phase testimony was incorporated into the sentencing phase. Appellant's specific argument is that guilt-phase counsel should have sought a ruling from the court requiring Mr. Patel's testimony to be presented via videotape, so that the jury would not have seen him in person. In this regard, Appellant maintains that counsel should have drawn the court's attention to criminal procedural rule 500, which Appellant interprets broadly as "permit[ting] the presentation of a witness through video deposition when doing so would be in the interests of justice and due to exceptional circumstances." Brief for Appellant at 65.

Rule 500, entitled, "Preservation of Testimony After Institution of Criminal Proceedings," provides:

> At any time after the institution of a criminal proceedings, upon motion of any party, and after notice and hearing, the court may order the taking and preserving of the testimony of any witness who may be unavailable for trial or for any other proceeding, or when due to exceptional circumstances, it is in the interests of justice that the witness' testimony be preserved.

Pa.R.Crim.P. 500(a)(1). Although Mr. Patel was not unavailable for trial, Appellant argues that his "shocking and heart wrenching" condition amounted to "exceptional circumstances" for purposes of the rule, so that presenting his testimony by videotape would have been in the interests of justice. Brief for Appellant at 65.

While Rule 500 suggests that, even apart from witness unavailability, there may be "exceptional circumstances" where the interests of justice require some form of action, that action is limited to the preservation of a witness's testimony for use in later proceedings. The Rule simply does not address an asserted need to alter the manner in which an available witness testifies at trial. This limitation in the Rule's scope is confirmed by its official commentary, which states that the "rule is intended to provide the means by which testimony may be preserved for use at a subsequent stage in the criminal proceedings." Pa.R.Crim.P. 500, Official Cmt. Thus, although Mr. Patel's circumstances may have been exceptional in one sense, they were not exceptional in the sense contemplated by the Rule, since they did not require that his testimony be preserved for later use. *Cf. Commonwealth v. Rizzo*, 556 Pa. 10, 16, 726 A.2d 378, 381 (1999) ("It is not exceptional [for purposes of the Rule] that witnesses refuse to testify in the manner which the Commonwealth might wish."). *See generally* PCRA Court Opinion, *slip op.* at 29 (concluding that Appellant had not offered any basis to conclude "that allowing a victim of a crime to testify in person about the actual crime is somehow too prejudicial if the victim has visible evidence of the harm done"). Accordingly, Appel-

lant's ineffectiveness claim is based on a misreading of Rule 500.

## H. Failure to move to suppress physical evidence

In an argument spanning less than a single page, Appellant claims that counsel was ineffective for failing to seek suppression of certain evidence. Notably, Appellant does not indicate in his brief what the evidence was or how he believes its introduction at trial undermines confidence in the outcome of the proceedings. Nevertheless, Appellant does refer to this Court's disposition of his direct appeal, in which the Court noted that the police seized his computer, which contained files "reveal[ing] evidence of Appellant's racist and anti-immigrant philosophies." *Baumhammers*, 599 Pa. at 29, 960 A.2d at 76. Appellant also presently refers to the trial court's opinion denying post-sentence motions, which lists the items in general terms as a "computer and some documents found in his room," *Commonwealth v. Baumhammers*, CC Nos. 2000–14712–14714, *Opinion Disposing of Post–Sentence Motions*, *slip op.* at 10 (C.P. Allegheny Dec. 29, 2005) ("Opinion on Post–Sentence Motions"), *reprinted in* Brief for Appellant at C–10, which in turn is mirrored by the PCRA petition's allegations. *See* Amended Petition at 64, ¶ 117. Thus, for purposes of this claim we will assume the items in question entailed Appellant's computer (together with its internal files), which was located in his room, as well as other unspecified documents found in his room.

As explained, however, Appellant has not provided this Court with any developed advocacy on this issue. Therefore, "the issue must be deemed waived in this Court." *Commonwealth v. D'Amato*, 579 Pa. 490, 504, 856 A.2d 806, 814 (2004).

## I. Failure to request or accept change of venire or venue

Appellant's next contention is that counsel was ineffective for failing to accept the trial court's offer of a change of venue, or a change of venire whereby jurors would be brought in from a different county to hear the evidence and decide the case. *See* Brief for Appellant at 67–68.

At a pre-trial hearing on March 21, 2001, the trial court noted that the case had generated a significant amount of publicity, including numerous stories in the news media, and that the court was prepared to grant any defense request for a change of venire. Counsel preemptively objected to any such change that the court might order *sua sponte*, expressing his view that the case should be tried by a properly-vetted Allegheny County jury. Counsel indicated that his position in this regard was based on "defense tactical reasons," N.T., Mar. 21, 2001, at 4–5, which included counsel's view that an Allegheny County jury would be more receptive to the proffered insanity defense than would a jury drawn from a more rural county. *See Commonwealth v. Baumhammers*, CC Nos. 2000–14712–14714, *Findings of Fact, Opinion and Order*, at 14 (C.P. Allegheny March 26, 2001), *quoted in* Amended Petition, at 77, ¶ 144; *see also* Opinion on Post–Sentence Motions, *slip op.* at 6, *reprinted in* Brief for Appellant at C–6 (finding reasonable counsel's estimation that jurors from more rural counties would be more "conservative" and, as such, would be less likely to find Appellant not guilty by reason of insanity). Notably, in this regard, there was no suggestion of mistaken identity, and Appellant's only chance for an acquittal was via his proffered insanity defense.

Three weeks later, the topic of a possible change of venire or venue was revisited at another pre-trial hearing. On this occasion, the trial court conducted a colloquy with Appellant in which it reminded Appellant—who, as noted, was a licensed attorney—that he retained the final decision over how to plead, how to "proceed," and whether to testify. N.T., Apr. 11, 2001, at 171. The court additionally explained that it had found that a substantial amount of prejudicial pretrial publicity had occurred concerning Appellant's case. The court noted, in this respect, that it had held hearings on the nature and extent of pretrial publicity, and that it had twice conducted a test of potential jurors and determined that three quarters of them had formed an opinion concerning Appellant's guilt. Thus, the court informed Appellant that he was entitled to a change of venire. *See id.* at 170.

During the colloquy, Appellant confirmed unequivocally that: he understood the nature of the prejudicial pretrial publicity and other factors described by the court; he understood all of his rights, including the right to a jury free from the effects of pretrial publicity; he was not under threat or compulsion; and no promises were made to induce him to waive any right to a change in venire or venue. Further, Appellant testified that he understood that, by waiving his right to request a change of venue or venire, he was also waiving his ability to contend in post-trial motions or on appeal that he was denied a fair trial because the jury was unfairly prejudiced by pretrial publicity. Nonetheless, Appellant assured the court that it was not only his attorneys' decision that he be tried by an Allegheny County jury, but that it was his personal decision as well. *See* N.T., Apr. 11, 2001, at 169–73. The trial court found Appellant's waiver to be knowing, intelligent and voluntary. *See* Opinion on Post–Sentence Motions, *slip op.* at 5, *reprinted in* Brief for Appellant at C–5.

Notwithstanding these assurances, Appellant did, in fact, argue in post-sentence motions and on direct appeal that he was denied a fair trial by the court's failure to order a change of venue or venire *sua sponte* over his objection. In light of the objection lodged by counsel to such a change, this Court found the claim waived.[25] Hence, Appellant now seeks relief through an ineffectiveness overlay.

Appellant's approach in this regard is undermined by the fact that he does not challenge the quality of his waiver which, as noted, the trial court found to be adequate. Our own review likewise reflects that the waiver colloquy was extensive

25. This Court added that, "in rejecting Appellant's post-sentence argument on this issue, the trial court specifically determined that the record of the jury selection process established that it was possible to select a jury untainted by prejudicial pre-trial publicity" and that "[s]uch a jury was, in fact, selected in this matter." *Baumhammers*, 599 Pa. at 26–27, 960 A.2d at 75 (internal quotation marks and citation omitted). Although Appellant's current argument fails to cast doubt upon the trial court's or this Court's post-trial assessment in this regard, we need not reach the issue of actual prejudice in light of our holding that Appellant's waiver forecloses relief in the circumstances.

in that the court warned Appellant thoroughly of the possible pitfalls of proceeding with an Allegheny County jury, and that Appellant's responses were coherent. Because a defendant has a constitutionally-guaranteed, "inviolate" right to be tried by a jury drawn from "the vicinage" in question, PA. CONST. art. I, §§ 6, 9; *see William Goldman Theatres, Inc. v. Dana,* 405 Pa. 83, 93–95, 173 A.2d 59, 64–65 (1961),[26] the trial court was precluded by our state charter from overriding Appellant's personal decision, as he expressed it to the satisfaction of that tribunal, to be tried by an Allegheny County jury.

Under the circumstances—where Appellant had the right to a change in venue or venire based on the trial court's findings, and additionally had a constitutional right to be tried by an Allegheny County jury—this case is directly analogous to those dealing with waivers of counsel. In such instances, the defendant has the right to representation by counsel, and also the right to forego such representation upon a valid waiver. *See Commonwealth v. El,* 602 Pa. 126, 134, 977 A.2d 1158, 1162 (2009). Therefore, this Court's decision in *Commonwealth v. Starr,* 541 Pa. 564, 664 A.2d 1326 (1995), which dealt with a waiver of counsel, is instructive. In *Starr,* the Court held that the trial court committed reversible error by denying the defendant's assertion of his constitutional right to represent himself. *See id.* at 580–90, 664 A.2d at 1334–39. Likewise, and as noted, it would have been reversible error for the trial court to override Appellant's assertion of his constitutional right to be tried by a jury of the vicinage. *Accord* Opinion on Post–Sentence Motions, *slip op.* at 7, *reprinted in* Brief for Appellant at C–7 ("This Court is satisfied that it no more had the power to overrule [Appellant's] constitutional right to be tried by jury of his vicinage, than it had to overrule a defendant's right to self-representation in *Starr.*"). In sum, then, since Appellant waived his rights in this regard, he cannot now obtain relief premised upon a claim that his counsel was ineffective for failing to request such a change.

**26.** Although *William Goldman Theatres* was decided before certain constitutional amendments were adopted in 1967 and 1968, the relevant language contained in Sections 6 and 9 of Article I has not changed.

## J. Cumulative error

Finally, Appellant indicates that he is entitled to relief based on the cumulative effect of the errors he identifies above. However, nothing in Appellant's presentation, individually or cumulatively, convinces us that he is entitled to relief.

The order of the PCRA court is affirmed.

Chief Justice CASTILLE and Justices EAKIN, BAER, TODD, McCAFFERY and STEVENS join the opinion.